IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

OSBORN TRANSPORTATION, INC., )
)
    Plaintiff, )
) Civil Action No.
v. )
) 99-AR-0524-M
AI TRANSPORT, DIVISION OF THE )
INSURANCE COMPANY OF THE STATE )
OF PENNSYLVANIA, )
)
    Defendant. )

## MEMORANDUM OPINION

Before the court is defendant's motion for summary judgment. The complaint of plaintiff, Osborn Transportation, Inc. ("Osborn"), claims that defendant, AI Transport ("AIT"), breached a contract, committed fraud, and was negligent when AIT settled certain insurance claims against Osborn. For the reasons set forth in the opinion below, the court will grant AIT's motion for summary judgment.

### Pertinent and Undisputed Facts

Osborn is a Gadsden based trucking company. AIT is an insurer that provides automobile liability coverage, general liability coverage, and other coverages to commercial trucking companies. In the Spring of 1996, Osborn began soliciting proposals from various insurers for auto liability coverage to insure Osborn's trucking operations from July 1, 1996 to July 1, 1997. Paul Skelton

("Skelton"), Osborn's President, and Bob Adams ("Adams"), Osborn's Director of Properties and Compliance, were the Osborn employees primarily responsible for reviewing the various proposals submitted by insurers and negotiating the ultimate terms of Osborn's auto liability coverage each year.

Skelton has served as Osborn's President for approximately twelve years, and Adams had been involved in the review process for ten years. Osborn retained Alan Berman ("Berman") of Cobbs, Allen & Hall, a local independent insurance agency, to aid it in its solicitation and selection of auto liability coverage. Berman served as Osborn's agent for the purposes of dealing with several potential insurers. Berman had prior experience with commercial insurance. Approximately 90% of his business involved insurance coverage for commercial clients.

One of the insurers that Berman contacted regarding Osborn's auto liability coverage was AIT. AIT submitted a proposal to Osborn, and representatives of AIT met with Osborn in late May or early June of 1996 to discuss in more detail Osborn's liability coverage for the upcoming policy period. The substance of the conversations during those meetings is in dispute. Skelton claims that he expressed Osborn's disappointment with its previous insurance carrier because that carrier did not consult with Osborn

prior to settling certain claims.  Skelton says that AIT assured him that they would not settle any of those kinds of claims "out from under" Osborn.  In other words, Skelton says that AIT agreed not to settle certain claims without Osborn's involvement and approval.[1]

Osborn ultimately awarded its auto liability insurance to AIT.  AIT then delivered to Osborn an auto liability policy and a separate, so-called Deductible Security Agreement.  The policy specifically provided that AIT "may investigate and settle any claim or 'suit' as we consider appropriate."  It also stated that Osborn "must cooperate with [AIT] in the investigation, settlement, or defense of [any] claim or 'suit.'"  Skelton signed and executed these agreements on behalf of Osborn.

After the policy went into effect, Osborn reported two claims to AIT.  AIT settled the claims without seeking Osborn's consent.  On August 3, 1996, Ray Mitchell ("Mitchell"), Osborn's Safety and Personnel Director, sent a letter to Skelton, complaining about the

---

[1] It is not clear to the court exactly what kind of claims Skelton wanted approval of because there is conflicting and unclear testimony on this point. Some testimony indicates that Osborn wanted approval of the settlement of all claims, some testimony indicates that Osborn wanted approval of the settlement of all claims up to $250,000 and other testimony indicates that Osborn wanted approval of the settlement of claims that ranged from $250,000 to $500,000.  However, as will be pointed out *infra*, the difference in the three options is irrelevant for summary judgment purposes.

way in which AIT had handled the claims.  Mitchell stated

> Our experience with A.I.T. has not been very gratifying to date, but if they will accept the following basic principles, we should move ahead with our relations:... Provide appraisals for Osborn review and <u>obtain authorization</u> before settling claim....Once they [AIT employees] are informed of the basic principles and accept them, we can form the team you envisioned.

Osborn also expressed its dissatisfaction to AIT, and on or about August 5, 1996, representatives from AIT and Osborn met to discuss the handling of the two claims and the parties' agreement. The substance of the conversations during that meeting are both disputed and not presented with any clarity to this court.

Regardless of what occurred at that meeting, it is undisputed that in July of 1997 Osborn renewed its contract with AIT, and that AIT thereupon delivered to Osborn a policy and Deductible Security Agreement identical in all relevant respects to the policy and Deductible Security Agreement from the previous year.

In September of 1998, AIT decided to settle a fatal accident claim that had been covered by Osborn's 1996-1997 policy (the "McDonald" claim). Prior to the settlement, AIT's claims adjuster, Mike McCool ("McCool"), discussed the strengths and weaknesses of the claim at length with Osborn personnel. He informed representatives of Osborn that, based on his assessment and AIT's attorney's opinion, it was AIT's position that the claim should be

4

settled rather than tried. Osborn disagreed, and stated its position that the claim was not to be settled, that nothing should be paid to decedent's estate, and that the case should be tried to a jury.

After receiving Osborn's input, McCool ignored Osborn's position and proceeded to settle the case for $450,000. AIT then sought reimbursement from Osborn for its $250,000 deductible portion of the settlement. Osborn refused to reimburse AIT on the ground that it did not agree with AIT's decision to settle the case. AIT then informed Osborn that it would exercise its contractual right to withdraw the amount of the deductible from the letter of credit that Osborn had posted pursuant to the Deductible Security Agreements. Shortly thereafter, Osborn instituted this action, alleging breach of contract, fraud, and negligence.[2]

### Summary Judgment Standard

Rule 56(c), F.R.Civ.P. provides that summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories,

---

[2] There are four specific insurance claims at issue in this case. One occurred in September of 1996 ("McDonald"), and two occurred in January of 1997 ("Freeman" and "Ferguson"). Those three are governed by the 1996-1997 policy and Deductible Security Agreement. The remaining claim occurred in September of 1997 ("Cummings"), so it is governed by the 1997-1998 policy and Deductible Security Agreement. However, as the court pointed out *supra*, the language of the policies and Deductible Security Agreements for the two policy years are identical. Therefore, they will be analyzed under the same standard.

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court has emphasized that this language means exactly what it says: there must be a <u>genuine</u> issue of <u>material</u> fact, not merely some factual dispute. See <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-248, 106 S.Ct. 2505, 2510 (1986). What this standard means in practice is that "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." <u>Anderson</u>, 477 U.S. at 249, 106 S.Ct. at 2511 (citing <u>First National Bank of Arizona v. Cities Service Co.</u>, 391 U.S. 253, 88 S.Ct. 1575 (1968)).

On defendant's motion for summary judgment, the court must look at the evidence, construed in plaintiff's favor, to see if a jury could return a verdict for plaintiff. If so, defendant's motion for summary judgment must be denied. If, however, as a matter of law, a jury could not return a verdict for plaintiff, defendant's motion must be granted.

### **Breach of Contract**

The court notes initially that Georgia law governs Osborn's breach of contract claim because of the choice of law provision in

the Deductible Security Agreement.³ The Supreme Court of Georgia has stated, "Where the terms and conditions of an insurance policy are unambiguous, the court must declare the contract as made by the parties. Where the meaning is plain and obvious, it should be treated as literally provided therein." Genone v. Citizens Ins. Co. of N.J., 60 S.E.2d 125, 127 (Ga. 1950)(internal citations omitted). Furthermore, "It has long been the law [of Georgia] that the parol evidence rule prohibits the consideration of evidence of a prior or contemporaneous oral agreement to alter, vary, or change the unambiguous terms of a written contract." Isaacson v. Carbo, 336 S.E.2d 373, 374 (Ga. Ct. App. 1985) (quoting Sentry Engineering v. American Olean Tile Co., 324 S.E.2d 591 (Ga. Ct. App. 1984)).

The court is somewhat puzzled by the fact that Osborn did not cite to a single case or legal principle in its brief in opposition to AIT's motion for summary judgment. For example, Osborn did not argue, as a way around the law outlined above, that the contract terms were ambiguous. Instead, Osborn focused only on the prior oral discussions between the parties.

Whatever was said or even agreed to orally between the parties

---

³ In its brief in opposition to AIT's motion for summary judgment, Osborn did not contest the applicability or the validity of the choice of law provision, so the court assumes that Osborn agrees that Georgia law controls its breach of contract claim.

7

prior to the signing of the policy and the Deductible Security Agreement is irrelevant, because the court finds that the language of the policy is unambiguous.  The policy states that AIT "may investigate and settle any claim or 'suit' as [it] consider[s] appropriate."  The court cannot see how this can be interpreted any other way than that AIT has the authority to investigate or settle any claim or suit **as it sees fit**, which necessarily implies that it may do so without Osborn's approval.  Because Osborn's evidence of any prior oral agreement would alter, vary, or change the unambiguous terms of the written agreement, the court cannot consider that evidence.

Furthermore, the Deductible Security Agreement contains an integration clause which provides the following:

> This agreement, including its attachments and exhibits, and the policies of insurance which are subject hereto, embody the entirety of the agreement and contain any and all understandings between Insured and Company as respects the subject matter of this agreement.  This agreement supersedes all prior understandings, promises, and agreements between the parties hereto, either written or oral, with respects [sic] to the subject matter hereof.

Deductible Security Agreement, ¶ 4.c (Ex. 4, Def.'s Motion for Summary Judgment).

Therefore, the written agreement between the parties explicitly provides that the writing supersedes any prior oral agreements.

8

In its brief, Osborn points to the testimony of AIT's expert, Randal O'Neill ("O'Neill"), as evidence that it is common practice in the insurance industry for an insured with a large deductible to have a lot of input into the settlement of claims. O'Neill stated that from his experience, when there is a large deductible, the insurance company "would allow provisions or have agreements allowing" the insured to have some involvement "in negotiations and settlement of claims." (O'Neill depo. at 31-32.) However, an expert's opinion on what may be customary is irrelevant, because the parties' subsequent writing explicitly provided that AIT would have the authority to settle claims without Osborn's consent, and, as was pointed out above, the law does not allow evidence of prior oral representations when the contract language is unambiguous.

In sum, while there is evidence that AIT orally promised Osborn that Osborn would have input into claim settlement, the written policy unambiguously gives AIT the authority to settle any claim or suit as it considers appropriate. Furthermore, the evidence demonstrates that Osborn, acting through Skelton, Adams, and Berman knew that the language was in the policy agreement because Skelton and Adams disapproved of the language. (See Adams depo. at 93, Berman depo. at 69). Nonetheless, Skelton signed the policy and Deductible Security Agreement with AIT, not once but two

years in a row.  While contract law creates certain exceptions for parties with grossly unequal bargaining power, none of those exceptions helps Osborn here.  The fact of the matter is that Osborn is a sophisticated commercial party with bargaining power equal to that of AIT, and Osborn signed the policies and Deductible Security Agreements.

The only remaining argument that Osborn could possibly make is that is that the original agreement was modified.  Osborn's brief points to a letter from Mitchell to Skelton as evidence that there was a binding modification of the contract.  The letter states:

> Our experience with AIT has not been very gratifying to date, but if they will accept the following basic principles, we should move ahead with our relations: ... Provide appraisals for Osborn's review and <u>obtain authorization</u> before settling claim....Once they [AIT employees] are informed of the basic principles and accept them, we can form the team you envisioned.

Letter from Mitchell to Skelton, August 3, 1996 at 3 (Pl.'s Ex. 4 to O'Neill's deposition).

This court cannot comprehend how an **internal** memorandum, written by an employee of one party to another employee of the same party, complaining about the other party's performance, can be considered a modification of an existing contract.  It is a basic and fundamental principle of contract law that there has to be a meeting of the minds and mutual assent to any modification, and an

internal letter between employees of one party does not qualify. Furthermore, the Deductible Security Agreement explicitly says that the agreement "cannot be modified, amended, or changed except by a writing signed by the parties hereto or their duly authorized representatives." Deductible Security Agreement, ¶ 4.c. Therefore, even though Osborn and AIT had another meeting in early August of 1996 to discuss their disagreements over the claim settlements in July of 1996, it is once again irrelevant what may or may not have been said at that meeting because there was no writing signed by the parties which modified, amended, or changed the parties' original written agreement.[4]

On the basis of the foregoing, the court finds that there is no evidence that the parties made a binding and enforceable modification to the 1996-1997 policy. Because the 1997-1998 policy contained the same language as the 1996-1997 policy, defendant's motion for summary judgment as to plaintiff's breach of contract claim will be granted as to all insurance claim settlements.

---

[4] The court also notes that the letter from Mitchell is further evidence that Osborn's right to be involved in the settlement of claims was **not** a part of the original agreement between the parties because his letter states that Osborn should move ahead with its relations with AIT "**if** they [AIT] will accept the following basic principles." (emphasis added).

**Fraud**

In Counts II, III, and IV of its complaint, Osborn alleges that AIT should be held liable for fraud, deceit, and fraudulent deceit under Ala. Code §§ 6-5-101, 6-5-103 and 6-5-104 for allegedly misrepresenting to Osborn that it would have the right to participate in the handling of claims and to approve claim settlements. These statutory provisions represent the State of Alabama's codification of the common law tort of fraud. See Barrett v. Farmers & Merchants Bank of Piedmont, 451 So.2d 257, 264 (Ala. 1984). In order to establish a claim for fraud under Alabama law, Osborn must show the following: (1) that AIT misrepresented a material fact; (2) that the misrepresentation was made either wilfully, recklessly, without knowledge or mistakenly; (3) that Osborn reasonably relied on the misrepresentation; and (4) that the misrepresentation caused damage as a proximate consequence. See Foremost Ins. Co. v. Parham, 693 So.2d 409, 421-423 (Ala. 1997)(outlining the elements of fraud and substituting the "reasonable reliance" standard for the "justifiable reliance" standard for all cases filed after March 14, 1997).

AIT argues that Osborn's fraud claim fails because Osborn cannot show that its reliance on any of AIT's oral representations was reasonable. As the Alabama Supreme Court has made clear, a

12

fraud claim "cannot be predicated upon a verbal statement made before execution of a written contract when a provision in that contract contradicts the verbal statement." Tyler v. Equitable Life Assurance Soc'y, 512 So.2d 55, 57 (Ala. 1987). The Eleventh Circuit reiterated that principle and held that "contract provisions that are contrary to prior oral representations give the party a reason to doubt the truth of the representations, thereby rendering any reliance on those representations unreasonable." McGriff v. Minnesota Mutual Life Ins. Co., 127 F.3d 1410, 1415 (11th Cir. 1997).

Based on the foregoing, the court finds that, as a matter of law, it was not reasonable for Osborn to have relied on any alleged oral misrepresentations made by AIT because, as was pointed out *supra*, the contract explicitly and unambiguously gave AIT the authority to settle claims as it deemed appropriate. As was also stated before, Osborn's evidence shows that Osborn's representatives objected to those terms during negotiations, so it is undisputed that Osborn knew that the terms were part of the agreement. In sum, because the parties' written agreements directly contradict the oral representations that underlie Osborn's fraud claim, it was not reasonable for Osborn to rely on those representations. Otherwise, the written language of a contract can

13

be avoided in all cases by the simple device of alleging that there was an oral representation to the contrary. The absence of any attempt to rescind on the basis of fraud in the inducement is also revealing. The court will grant summary judgment as to Osborn's fraud claims.

### Negligence

In Counts V and VI of its complaint, Osborn alleges that AIT is liable for negligence because it "negligently adjusted claims on behalf of Osborn Transportation." Complaint ¶¶ 45, 53. However, other than arguing that AIT breached its contract with Osborn by settling claims without Osborn's input or approval, Osborn has not demonstrated to this court what duty or duties AIT breached with regard to the four automobile liability claims at issue. In fact, Osborn's brief does not make any arguments regarding the negligence claim at all. Without a breach of some duty, there can be no claim for negligence. Because the court has not been directed to any duty which AIT allegedly breached, the court will grant AIT's motion for summary judgment as to Osborn's negligence claims as well.

### Conclusion

The deposition testimony of Osborn's representatives is replete with references to Osborn's desire to have input into the

settlement of claims. Berman testified that the "hot button" issue for Osborn was ensuring that claims would be handled as Osborn wanted them handled. (Berman depo. at 45, 267-268.) However, as the court hopefully has made clear, when parties enter into an unambiguous written agreement, that agreement controls, despite what the parties may have said to each other before signing the agreement. It is inherently difficult to prove oral representations, and it is exactly for that reason that contract law makes written agreements paramount over prior oral agreements. The lesson to be learned here is that if something is important enough to one party so as to be a "deal breaker" (as substantial settlement input apparently was here to Osborn), that party should **put it in writing**. This may very well be a hard lesson for Osborn to learn, but it is one that the court is compelled to teach.

A separate and appropriate order will be entered.

DONE this 2nd day of June, 2000.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE